**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 200521-U

Order filed March 21, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Tazewell County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0521<br>Circuit No. 78-CF-1369 |
| JAMES LEROY CHILDERS, | ) ) ) | Honorable<br>Katherine S. Gorman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE DAUGHERITY delivered the judgment of the court.
Justices Lytton and McDade concurred in the judgment.

**ORDER**

¶ 1       *Held*:   The circuit court did not abuse its discretion in sentencing defendant.

¶ 2       Defendant, James Leroy Childers, appeals his sentence. He argues that the Tazewell County circuit court abused its discretion in sentencing him to life imprisonment because it failed to adequately consider his potential for rehabilitation. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4    In 1979, defendant was found guilty of three counts of murder (Ill. Rev. Stat. 1979, ch. 38, ¶ 9-1) for the murders of his mother, stepfather, and younger brother. Defendant was 17 years old at the time of the murders. Defendant confessed to the murders after giving two prior statements in which he had denied responsibility. His confession indicated he engaged in an argument with his mother and stepfather prior to the killings. He stabbed and shot his mother and stepfather. Defendant stabbed and killed his brother when he tried to escape the home. Defendant attempted to create the appearance of a robbery. He placed the gun and knife he used, money he stole from his mother and stepfather's wallets, and the clothing he was wearing in a paper sack and, after cleaning himself up, threw the sack into a river.

¶ 5    Defendant raised an insanity defense. Two experts testified he could not conform his behavior to the law and three testified he could. The jury found him guilty. The court found the murders to be exceptionally brutal and heinous behavior, indicative of wanton cruelty and, in its discretion, sentenced defendant to three concurrent prison terms of natural life.

¶ 6    Defendant appealed and argued, among other things, that his sentence was excessive. This court affirmed and noted that "[t]he evidence from the pathologist indicating the number of times the victims were stabbed, shot, and mutilated, alone would indicate brutal and heinous behavior." *People v. Childers*, 94 Ill. App. 3d 104, 113-14 (1981).

¶ 7    Defendant eventually filed a successive postconviction petition seeking a new sentencing hearing under *Miller v. Alabama*, 567 U.S. 460 (2012), because the court did not consider his youth and its attendant circumstances prior to sentencing him to life imprisonment. Defendant was given a new sentencing hearing in 2020.

¶ 8    An updated presentence investigation report (PSI) was prepared. The updated PSI indicated that defendant worked a variety of jobs while imprisoned and donated a portion of his

2

income to charity. Further, while incarcerated, defendant obtained an associate's degree, a bachelor's degree, and a veterinarian's assistant certification. Defendant received several commendations for his behavior in prison. The PSI stated that defendant reported that he did not have any drug or alcohol issues prior to his incarceration. The PSI included, as an attachment, a developmental analysis of defendant from an expert in developmental psychology, Dr. James Garbarino. This analysis indicated that defendant reported to Garbarino that he had severe substance abuse leading up to the crime, specifically he "began to drink, smoke pot, smoked hash, did speed, Acid, Quaaludes. Even did mescaline." In contrast to defendant's confession indicating that an argument with his mother and stepfather preceded the murders, defendant indicated to Garbarino that he arrived home to his brother threatening suicide, that he took the gun away from his brother but then " '[s]omething in [him] just snapped' "—he entered his mother and stepfather's bedroom and put the gun to his head but instead of pulling the trigger he re-aimed the gun at them and began shooting.

¶ 9        At the sentencing hearing, the parties agreed that the potential sentencing range included life in prison. Garbarino testified on defendant's behalf. He testified that the brain does not fully develop until approximately 25 years of age, juveniles have less impulse control, and trauma leads to negative outcomes. Garbarino testified that on the adverse childhood experience scale, which consists of 10 questions that defendant was asked, defendant scored as having experienced an extremely high level of trauma. In Garbarino's opinion, when defendant was 17 years old, he was not likely to be incorrigible or incapable of rehabilitation. Garbarino did not interview defendant in person and did not believe he had ever spoken to defendant. He relied upon correspondence, records from the trial, and materials about defendant's activities in prison. Garbarino had access to the entire trial transcript but principally focused on the clinician's

3

testimony. Garbarino was not sure if he read defendant's confession but believed he may have seen a summary of it. He admitted the account of the murders that defendant provided him was different than defendant's confession but stated that the particulars of the crime were not developmentally significant. Defendant also presented testimony from his cousin, aunt, and a former classmate. His cousin testified that defendant "was a good kid with a big heart" and she never saw him have any fits of rage. Defendant's aunt stated that she did not see him often when he was a teenager but she did not know him to be a depressive or moody teenager, and he was his normal self when she saw him. Defendant's aunt noted that defendant's mother was very critical of him. Defendant's former classmate testified that he was rambunctious but was not a problem child.

¶ 10     During argument, the State highlighted inconsistencies in what defendant said, including as to whether it was his mother or stepfather who abused him, and argued that the only consistency by defendant was that he would tell the story that he thought would help him. It argued that at 17 years old, defendant was nearly an adult who was doing things that required responsibility and organization. Additionally, the State argued that defendant was an outlier who committed a horrific crime and the only way to describe his conduct was that it was irretrievably depraved, permanently incorrigible, and beyond the possibility of rehabilitation.

¶ 11     Defense counsel argued that at the time of the crimes, defendant was in a depressive state and was not rational. Further, that the testimony from his cousin, aunt and former classmate showed that he generally did not have the personality to hurt people and that the murders may have been an aberration.

¶ 12     The court noted that it considered the PSI, the evidence and arguments presented, and the entire court file. It further noted that it was specifically considering "the *Miller* factors contained

4

in 730 ILCS 5/5-4.5-105(a)" in its ruling. The court stated that throughout the proceedings there was an undercurrent of defendant's age and that he had been evaluated by at least five professionals. It stated that defendant, after shooting his stepfather, shot him again, and returned to kill him with a knife, then brutally stabbed and cut his mother and stabbed his younger brother. The court continued that afterwards, defendant

> "took significant steps to try to alter the course of things so that [he] would not be caught, and the Court would submit that [defendant], at that time, most certainly had an appreciation for the risk and consequences of the thing that [he] had done, and there's nothing to suggest that [defendant was] running with a bad crowd."

The court further stated that defendant had taken advantage of the opportunities available to him in prison, had benefited from the structured prison environment, and "the Court is not considering that *per se*, but under these unique circumstances, 42 years later, you really want me to focus on your potential for rehabilitation because you have done some things that the Court will acknowledge would suggest that rehabilitation may be accomplished." Additionally, the court noted defendant's lack of a criminal history and that he was able to meaningfully participate in his defense. The court found defendant's behavior was indicative of irretrievable depravity, permanent incorrigibility or irreparable corruption beyond the possibility of rehabilitation and resentenced defendant to natural life without parole. Defendant appeals.

¶ 13                                                    II. ANALYSIS

¶ 14            Defendant argues that the circuit court abused its discretion in sentencing him to three life sentences because it failed to properly consider his demonstrated and well-documented rehabilitation. He further argues that the court's statement that he had "done some things" that

would suggest rehabilitation could be accomplished was contrary to its finding that he was beyond the possibility of rehabilitation.

¶ 15     In *Miller*, the United States Supreme Court held that the eighth amendment prohibits mandatory life sentences for juveniles who commit murder. *Miller*, 567 U.S. at 489. *Miller* applies retroactively. *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016). Our supreme court has determined that the holdings in *Miller* and *Montgomery* apply to discretionary sentences of life without parole for juveniles. *People v. Holman*, 2017 IL 120655, ¶ 40. The *Holman* court stated that, under *Miller*, a juvenile may be sentenced to life in prison without the possibility of parole "if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* ¶ 46. Further, that the court could only make that determination after considering defendant's youth and its attendant characteristics, which includes defendant's prospects for rehabilitation. *Id.* However, our supreme court has since called into question the holding in *Holman*, that *Miller* and *Montgomery* apply to discretionary life sentences. See *People v. Dorsey*, 2021 IL 123010, ¶ 42. Regardless, defendant was given a new sentencing hearing, and section 5-4.5-105(a) of the Unified Code of Corrections requires that prior to sentencing a defendant who was under the age of 18 at the time of the offense, the court must consider the nine factors set forth therein as additional factors in mitigation. 730 ILCS 5/5-4.5-105(a) (West 2020). One of those factors is the "potential for rehabilitation or evidence of rehabilitation, or both." *Id.* § 5-4.5-105(a)(4).

¶ 16     "It is well settled that a trial judge's sentencing decisions are entitled to great deference and will not be altered on appeal absent an abuse of discretion." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). A reviewing court "must not substitute its judgment for that of the trial court simply because the reviewing court would have weighed the factors differently." *Id.* at 800-01. A

6

sentence that falls within the statutorily prescribed range is presumptively valid (*People v. Busse*, 2016 IL App (1st) 142941, ¶ 27), and "is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense" (*People v. Franks*, 292 Ill. App. 3d 776, 779 (1997)). "Importantly, it is the seriousness of the crime—rather than the presence of mitigating factors—that is the most important factor in determining an appropriate sentence." *People v. Decatur*, 2015 IL App (1st) 130231, ¶ 12. The sentencing "court is not required to give defendant's rehabilitative potential more weight than the seriousness of the offense." *People v. Nussbaum*, 251 Ill. App. 3d 779, 781 (1993). We presume the circuit court considered the relevant factors and mitigation evidence presented. *People v. Wilson*, 2016 App (1st) 141063, ¶ 11. The court is not required to "recite and assign a value to each factor." *Id.* It is defendant's burden to show that the court did not consider the relevant factors. *Id.*

¶ 17 Here, the parties agreed that defendant faced up to life in prison at the sentencing hearing. Therefore, his life sentence is within the applicable range and is presumptively valid. Moreover, we cannot say that the life sentences are manifestly disproportionate to defendant's brutal killings of his mother, stepfather, and brother. Further, the record establishes that the court considered the factors in mitigation set forth in section 5-4.5-105(a). Additionally, it considered the testimony from defendant's witnesses and the updated PSI which included defendant's accomplishments and behavior while in prison. The court specifically acknowledged these accomplishments and indicated that they may suggest rehabilitation could be accomplished. Therefore, the record establishes that the court considered the relevant factors and information. While defendant would like the court to have given more weight to his accomplishments while incarcerated, the weight to be given mitigating factors is within the circuit court's discretion and we will not reweigh those factors on appeal. See *People v. Hageman*, 2020 IL App (3d) 170637,

7

¶ 19 ("It is not our duty on appeal to reweigh the factors involved in the circuit court's sentencing decision.").

¶ 18      Defendant also takes issue with the court's statement that he had "done some things" that suggest rehabilitation was possible when the court ultimately found he was beyond the possibility of rehabilitation. However, the court's statement merely shows that it was "properly engaged in weighing all of the necessary factors." See *People v. Helgesen*, 2020 IL App (2d) 160823-B, ¶ 29. Similar to the instant case, the defendant in *Helgesen* argued that because the circuit court stated he had shown the potential for rehabilitation—which included evidence he was a well behaved prisoner, held responsible jobs, and furthered his education—he could not be sentenced to what amounted to a *de facto* life sentence. *Id.* ¶¶ 27-28. The court disagreed and noted that "in fashioning these sentences, '[n]o single factor is dispositive.' " *Id.* ¶ 30 (quoting *People v. Lusby*, 2020 IL 124046, ¶ 35). Likewise, we determine that defendant's supposed potential for rehabilitation was but one factor for the court to consider in fashioning defendant's sentence and the court's statement shows it was considered. Notably, our supreme court's decision in *Dorsey* calls into question whether the court needed to make a finding of irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. See *Dorsey*, 2021 IL 123010, ¶¶ 41-42 (determining that *Holman*'s holding that *Miller* applied to discretionary life sentences was questionable in light of the United States Supreme Court decision in *Jones v. Mississippi*, 593 U.S. ___, ___, 141 S. Ct. 1307, 1314-16 (2021), which determined that a juvenile may be sentenced to life without parole as long as the sentencing court had discretion to consider youth and its attendant circumstances and that a finding of incorrigibility was not required). Based on the foregoing we conclude that the court did not abuse its discretion in sentencing defendant.

¶ 19                                    III. CONCLUSION

¶ 20        The judgment of the circuit court of Tazewell County is affirmed.

¶ 21        Affirmed.